## PennDOT v. McNichol

*Marc A. Werlinsky, assistant counsel,* for the Commonwealth.

*A. Roy DeCaro,* for defendant.

WRIGHT, *S.J.*, February 17, 1993—By a notice dated October 26, 1990, the Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing notified Sally R. McNichol that her driving privileges were suspended for a period of 12 months for failure to submit to a chemical test as provided for in section 1547 of the Vehicle Code (75 Pa.C.S. §1547). The effective date of the suspension was November 30, 1990. McNichol appealed the suspension to this court. After a court hearing and consideration of briefs and arguments of counsel, this court on October 7, 1992, entered an order sustaining the appeal and ordering that the driving privileges of McNichol be restored. Department appealed from that order to the Commonwealth Court of Pennsylvania, necessitating the writing of this opinion.

At the hearing, the department presented evidence that indicated that on October 4, 1990, a vehicle driven by McNichol "rear-ended" another vehicle at or near the intersection of West Chester Pike and Darby Road in Haverford Township, Delaware County, Pa. Department's evidence indicated that Officer Anthony Marchesani of the Haverford Township Police Department observed McNichol immediately after the accident, and based on his observations concluded that she had consumed an alcoholic beverage or beverages. He placed her under arrest for driving under the influence of alcohol, asked her to take a breathalyzer test, and advised her that if she failed to do so her driving privileges would be suspended for one year; and she refused to take the test.

McNichol in her appeal to this court alleges "that the officers did not adequately inform (McNichol) that her operating privileges would automatically be suspended for one year should she refuse to take a breathalyzer...."

On direct examination the officer testified at pages 5 and 6:

"At this time I informed her that she would have to take the Intoxilyzer 5000 breath test with refusal resulting in a one-year suspension of her driver's privilege. At this time she refused and was advised three additional times for a total of four times that if she refused, her license would be under suspension. She was allowed to make a couple of phone calls and she stated that whenever she was placed under arrest for driving under the influence, [she was told] by her friends that she should always refuse the test.

*"The court:* Did you say she was allowed to make calls?

*"The witness:* Yes."

*By Mr. Werlinsky:*

"*Q.* Was she allowed to make calls before or after the refusal was recorded?

"*A.* That was after...."

On cross-examination the officer testified at page 6:

"*Q.* Officer Marchesani, at the scene on West Chester Pike, at that time did Sally ask you or tell you that she wanted to make a phone call, that she wanted to talk to someone?

"*A. Yes, she did....*" (emphasis added)

At page 7:

"*Q.* And did you give her any—did you tell her that you wanted her to take a breathalyzer at that point? At the scene now, not at the police station.

"*A. I don't recall whether or not it was at the scene or not.*

"*Q. Then you took her back to the police station and at that point she again stated that she wanted to make a phone call, did she not?*

*"A.* I'm not sure when but I know we allowed her to make the phone call." (emphasis added)

On redirect examination the officer testified at page 11:

*"Q.* Officer Marchesani, I'm a little uncertain about this sequence here so let's go back to the scene. Was a request made by Ms. McNichol to call someone at the scene?

*"A.* She stated she wanted to make a phone call. As to who exactly, she never stated.

*"Q.* Was this before or after she was placed under arrest?

*"A.* I *believe* it was before.

*"Q.* At that time, prior to the arrest, when she made her request to call somebody, what, if anything, did you say to her?" (emphasis added)

At page 12:

*"A.* I told....

*"Mr. Decaro:* Your honor, we've covered this. I guess he's trying to rehabilitate the witness in some way.

*"Mr. Werlinsky:* I don't think we have.

*"The court:* That's what he's trying to do, all right, overruled.

*"Mr. Decaro:* But I mean, we've covered this unless there's some new and additional testimony.

*"The court:* Overruled, overruled."

*By Mr. Werlinsky:*

*"Q.* What, if anything, did you say to her at the scene when she requested to speak to someone?

*"A.* I told her that she did not have that right.

"*Mr. Decaro:* This is the first—your honor, that's the first time he said that after I cross-examined and after he told him what to say."

At page 13:

"*The court:* All right, now he said it."

*By Mr. Werlinsky:*

"*Q.* Did Ms. McNichol prior to a refusal being recorded back at the police station request to make a phone call?

"*A.* Yes, she did.

"*Q.* What, if anything, was she told at that point?

"*A.* I told her that at this point of the processing stage, she did not have that right. She became very argumentative, she refused to cooperate. She was advised four times of the consequences if she refused the test. After advising her that she would not be fingerprinted nor photographed until she called somebody. At this time she was allowed to make a phone call. She was given a telephone book to look up numerous numbers at which time she contacted a couple individuals...."

McNichol testified on direct examination at page 31:

"*A.* He asked me if—he said he thought he could smell alcohol, had I been drinking and I said yes, I had. And he asked me to take a breath test. And I said I didn't want to take it, that I thought I should not do that. I asked him if I could make a phone call and he said no. He did tell me again about the test, that I could lose my license for a year. He did do that twice, I don't think he did that four times. But he did do that.

"*Q.* All right. Why did you want to make a phone call at that point?

"*A.* Because I really didn't know what to do. I have never been in any trouble with the police, I was just

**6**

scared. I didn't know what I should do. I thought I was entitled to get—to make a phone call, get some advice as to what my rights were so I thought I shouldn't say anything else...."

At page 32:

"*Q.* All right. At the police station, did you again request to do anything or to call anyone?

"*A.* We walked in the police station and I asked again if I could make a phone call."

At page 33:

"*Q.* All right.

"*A.* And I was....

"*Q.* And were you permitted to make a phone call as soon as walking into the police station?

"*A.* No.

"*Q.* Were you said—were you told anything at the police station about the breathalyzer as far as you remember?

"*A.* No, at the police station I asked about the phone call and the comment was that I must watch too much television. I did get upset at that because I said to them I didn't think it was television, I thought I was entitled to make a phone call to get some advice.

"*Q.* All right. And at some....

"*A.* They said not at that time.

"*Q.* But at some point they allowed you to make a phone call?

"*A.* After they fingerprinted me, yes."

McNichol testified that after being fingerprinted she called an attorney and then asked the police if she could take the test.

On cross-examination McNichol testified at page 37:

"*Q.* Were you cooperative at the scene?

"*A.* I felt that I was cooperative to the point that I was upset. I was scared, I had asked about making a phone call and I was told I couldn't do that...."

At page 39:

"*Q.* No, no, listen to the question. Is it your testimony that your first request to make a phone call after being placed under arrest came at the police station?

"*A.* After being placed under arrest?

"*Q.* Right.

"*A.* Yes.

"*Q.* Do you recall where in the police station you were at the time that you requested to speak to someone?

"*A.* Yes, well, I came in a door right near a cell and then they went—we went into a long room. I mean, I don't know how to tell you the front or the back or—I don't know those details. I asked again about if I could please make a phone call and that was when the comment was that I watch too much television. And I found that upsetting because I though I was entitled to make a phone call...."

At page 41:

"*Q.* How long after you arrived at the police station was it—how much time elapsed after you arrived at the police station when you asked to speak to someone?

"*A.* As soon as we got to the police station, I asked again if I could make a phone call and I've said—and they said you watch too much television. Now I probably got upset then because I said I didn't think that was only television, I have never been in this situation. I didn't know but I thought I had the right to make a phone call and to get some advice. I believe that. I

thought that was my right. And he said not at this time. And so I did not make the phone call then.

"*Q.* When Officer Marchesani said to you not at this time, did you understand at that point that you could not make a phone call?

"*A.* Yes, he told me I could not make a phone call.

"*Q.* After that was said to you, what was the next thing you recall happening at the police station?

"*A.* They fingerprinted me...."

At page 43:

"*Q.* Did you argue with Officer Marchesani at the police station?

"*A.* No, I didn't argue with him. I did persist about making a phone call....

"*Q.* Did you ever say to Officer Marchesani that your friends told you that if you were ever arrested for drunken driving to refuse the chemical test?

"*A.* No, I did not say my friends told me anything. What I did say was I think I shouldn't take this. That's what I thought, which is obviously wrong but that's what I thought."

At page 44:

"*Q.* Where were you when you said I think I shouldn't take this?

"*A.* Standing on West Chester Pike.

"*Q.* So would it be correct to say, Ms. McNichol, that standing on West Chester Pike, you refused Officer Marchesani's request to submit to a breath test?

"*A.* Yes, I did...."

On redirect examination McNichol testified at page 44:

"*Q.* Standing on West Chester Pike, you refused this breath test until you could make a phone call, isn't that your testimony?

"*A.* Yes, that's correct.

"*Q.* And in fact, at any time that night, did—was it your understanding or did anyone explain to you that you had no right to speak to an attorney before you decided whether to take that test or not?

"*A.* No, nobody advised me of anything about an attorney."

At page 45:

"*Q.* And it was your clear understanding, at least from your mind, your understanding of watching television and *Miranda* that....

"*A.* That's what....

"*Q.* You could speak to an attorney first?

"*A.* My understanding was that I had a right to speak to an attorney but that I was not allowed to do that when I asked...."

As rebuttal the department called the officer as a witness and he testified:

"*Q.* Officer, earlier you testified that Ms. McNichol stated to you that her friends told her that if she were ever arrested for drunken driving, to refuse the test. Is that an accurate representation of your testimony?

"*A.* That's correct.

"*Q.* Where was she when she made that statement to you?

"*A.* In the arraignment room at Haverford Township Police Department.

"*Q.* Did you hear Ms. McNichol's testimony just now?

"*A.* Yes, I did.

"*Q.* Officer, did you hear Ms. McNichol testify that she was never requested to take a breath test while she was at the Haverford Township Police Department?

"*A.* Yes, I did.

"*Q.* Officer, was Ms. McNichol requested to take a breath test at the Haverford Township Police Department?

"*A.* Yes, she was, four times...."

The Supreme Court of Pennsylvania has clearly stated that a person who is requested to take a breathalyzer test must be told that, as to the breathalyzer test, there is no right to speak to anyone before taking the test. In *PennDOT, Bureau of Traffic Safety v. O'Connell,* 521 Pa. 242, 555 A.2d 873 (1989), our Supreme Court stated:

"Accordingly, where an arrestee requests to speak to or call an attorney, or anyone else, when requested to take a breathalyzer test, we insist that in addition to telling an arrestee that his license will be suspended for one year if he refuses to take a breathalyzer test, the police instruct the arrestee that such rights are inapplicable to the breathalyzer test and that the arrestee does not have the right to consult with an attorney or anyone else prior to taking the test."

In *PennDOT, Bureau of Driver Licensing v. Gaul,* 135 Pa. Commw. 491, 581 A.2d 261 (1992), our Commonwealth Court stated:

"Even though appellee refused to submit to the test immediately prior to requesting a conference with his attorney and the police gave no *Miranda* warnings, these facts do not eradicate the likelihood that appellee may have been confused about his right to legal counsel. Potential confusion over that issue was the concern of our Supreme Court in the *O'Connell* case. Therein, the court recognized the very real possibility that an arrestee may

be unable to distinguish between criminal and civil rights and procedures...."

In *PennDOT, Bureau of Driver Licensing v. Fiester,* 136 Pa. Commw. 342, 583 A.2d 31, the Commonwealth Court stated:

"Absent a situation which demonstrates a refusal on other grounds or for other reasons, our Supreme Court therefore is clearly mandating, when either a licensee requests to speak to someone (either his attorney or someone else) *or Miranda* warnings are given, that an affirmative duty of explanation on the part of the police exists to dispel any reliance by the driver on his/her constitutional right to counsel even in situations where there is no overt demonstration of confusion...." (emphasis added)

The officer's testimony was vague and contradictory. He used "I believe" on several occasions. An example of his contradiction is his testimony that McNichol said friends had told her if she were asked to take a chemical test that she should refuse. When he first testified to that he indicated that she made that statement when she was on West Chester Pike. When called on rebuttal he testified that she made that statement in the Haverford Township Police Station.

The trier of fact may believe all, part or none of the testimony of a witness.

Having heard the testimony of the witnesses and observing them during their testimony, it was clear to the court that from the time that McNichol came in contact with Officer Marchesani until she made the telephone call just before leaving the Haverford Township Police Station she believed that she had the right to call someone before she submitted to a breathalyzer test. She learned that she did not have that right when she was finally allowed to make a telephone call. The officer certainly

did not explain it to her. He gave no explanation at all. All he told her was she did not have the right "at this time." To a person who is under the impression that he or she has a right to make a telephone call what the officer said to McNichol means to such a person is that the police officer is depriving that person of his or her right. It certainly is not an explanation of why a telephone call is not permitted.

After hearing the testimony this court, inter alia, found the following facts:

(1) McNichol first asked to make a telephone call before the officer told her that she was under arrest.

(2) When on West Chester Pike McNichol refused to take the breathalyzer test.

(3) That officer did also ask McNichol while in the police station to take a breathalyzer test.

(4) That immediately after arriving at the police station and before being asked to take the test McNichol again asked to make a telephone call.

(5) That before and during the entire episode McNichol actually thought that she had the right to make a telephone call to someone before she was required to take the test.

(6) That telling McNichol that she did not have the right to make a telephone call "at this time" was not a sufficient explanation to her or to any reasonable person with even higher than average intelligence as to why she could not make a telephone call before making a decision whether or not to take the breathalyzer test.

The attorney for the department argues that the request to make a telephone call was made before McNichol was asked to take the test. In making that argument he overlooks or disregards the fact that after arriving at the police station and before the officer asked her to take the test she asked to make a telephone call, which request was

refused. McNichol was first asked to take the test when she was on West Chester Pike. When she was asked to take the test in the police station that was the second time that she was asked to take the test. Clearly the officer did not determine what she said on West Chester Pike as a refusal. If he had considered what she said when on West Chester Pike as a refusal then he would not have asked her to take the test after she was taken to the police station.

For the reasons stated herein we entered the order of October 7, 1992, sustaining McNichol's appeal and directing that McNichol's driving privileges be restored.